Good morning, Your Honor. Dean Dickey, appearing on behalf of all of the appellants. Mr. Dickey, good morning. Good morning, Your Honor. Andrew Fleming, appearing on behalf of the appellants. All right, gentlemen, we typically allocate 15 minutes per side. We can be flexible with that if necessary, as you can see from the last oral argument. Mr. Dickey, would you like to reserve a few minutes for rebuttal? I would, Your Honor. All right, absolutely. Mr. Fleming, you can take your seat. Mr. Dickey, whenever you're ready. On February 19, 2014, which was 60 days after Metropolitan Capital Bank, the appellee, obtained an order in which the mortgage and note, which was the subject of the foreclosure proceeding it was pursuing, was expressly extinguished and merged into a judgment for foreclosure. The February date is significant because it was on that date, 60 days after the judgment of foreclosure and sale was entered, that the parties, Metropolitan Capital Bank and the appellants, entered into an agreement for the purchase of the real estate, which Metropolitan Capital had foreclosed, by operation of the extinguishment of the mortgage and the note and its merger into the judgment for foreclosure. At the time the agreement was entered into, there was no credit agreement subject to the Illinois Credit Agreement Act, as all rights rested then in the judgment debtor, and all of its rights were judgment creditor, if you will, rights. Notwithstanding the fact of the merger, on a 2619 motion, the circuit court granted the motion to dismiss, with prejudice, all of the claims of the appellant. And it did so solely on the basis of the Illinois Credit Agreement Act. Mr. Dickey, if I could just clarify what your position is. Your position is, they worked out this agreement, the oral agreement was that they're just going to get their property back in DuPage County. This was all at the Drake Hotel, right over tea or something, they were coming up with the oral agreement, which is how we get jurisdiction in Cook County, I'm assuming. So we get this agreement, and you're saying that that isn't the existing credit agreement that Metropolitan had with RFO, because that was all extinguished. This is a completely new agreement, and there's no credit on this one. This is just an agreement that they're going to get the property back. But it is not unusual for banks, for closing on real estate, to make a sale of that real estate. Yes, but it's unusual to do it in their oral agreement. Wouldn't you agree with that? I would agree with that. I mean, it seems like you're dealing with banks and lawyers, isn't that usually everything's in writing? Well, I suppose if you're dealing with banking lawyers, perhaps, but in this case, you were dealing with lawyers. The agreement was struck between a representative executive of Metropolitan Bank and Mr. Robert Orey, an individual. There was some money exchanged in order to have this property back, correct? Well, the agreement was, and it's a new agreement, it was a simple real estate purchase agreement. The seller was going to sell the real estate it acquired by foreclosure to a buyer who was going to pay for the property at the agreed price once the sale was completed and the bank was entitled and in a position to deliver free title, or clear title, rather. So, and the agreement was simply that. Five days later, or six days later, on February 25, a writing was tendered reflecting the material term of... But that was unsigned, is that correct? Pardon me? That was unsigned. But there was a writing memorializing the terms of the agreement. That was unsigned. So you could write up anything you want and say, we have a writing for it. If it's not signed, what good does it do? Well, because in an oral agreement, there can be a writing that memorializes the agreement that demonstrates that there was an agreement. So, the fact of the matter is that takes it out of the statute of faults. Did Metropolitan Bank agree that that was the agreement? Well, we don't know whether they did or not because we were denied the opportunity to get an answer or to take any depositions. What we had was the legal argument that the credit act barred all of the claims, including the agreement claim, including which fiduciary did we claim? Mr. Dickey, so the agreement was that Metropolitan, once they got clear title to it, was going to sell it back to this gentleman? They were going to sell it to him, yes, for the price agreed upon, which was approximately $3 million. For the property that was estimated to be worth $20 million? Well, that was... Because the bank didn't want to do that? The bank's debt was $2.8 million. They got a piece of property that was worth substantially more and they were going to resell it to someone for what was all of the money that they had loaned and gotten in the property, plus all of the fees, expenses associated with it. There was a combination price. So, they were making some money going to be made whole because banks are not in the business of profiting generally on the property that they repossess or foreclose. So, they were going to foreclose $18 million of profit just because they thought that was a good idea? I don't know if they thought, and I can't tell you that, but that was the agreement. And the question, and this was before the sale, right? This was before the sale. The agreement took place on the 19th. The sale took place on the 20th. The writing, memorializing the agreement was sent on the 25th. What date did you say that the oral agreement took effect? The 19th of February. Okay. And the agreement was, as stated, for a new contract or a new agreement. You will sell us this property, we will buy this property at this price, and we'll do it when you get title. And we followed through demonstrating an intent to proceed. So, the oral agreement contemplated that the sale would be done. That entire transaction involving the foreclosure and the judgment of sale would all be done. You were making the agreement before, but the idea was, the contemplation was, we're not asking you to stop the foreclosure sale. We're not asking you to call up the sheriff and say, don't sell it. We're not asking that. That's your position. You're saying we... Absolutely, because... The deal was, after you get it, not knowing, by the way... Whether they would get it. Whether they would get it or how much they would pay for it. That's correct. Okay. They were the only bidder, as it turned out, and they did their judgment in full, which included no deficiency. So, at the time of the agreement, the day before the sale... Why would Metropolitan agree to a price on the 19th when it doesn't know, first of all, whether it's going to get the property, but more to the point, how much it's going to pay for it? Well, Your Honor, I can't answer that question for you, because we were not allowed to depose the individuals involved. The case was over before there was any factual development on that issue. I think I can explain why, given a lengthy relationship. But isn't that the reason for the credit agreement act, is so that we don't have situations like we have here, where we're arguing about, yes, you did, no, you didn't? Your Honor, I would respond by saying, we have a credit agreement act, and the history of the act is well known, I'm sure, to the court, but we must look at the statute. What is covered? And does this agreement, as pled, which we have to take as true for purposes of this proceeding, is it an agreement or commitment by a creditor to lend money? No. Is it an agreement or commitment to extend credit or delay the repayment of money? Since the oral agreement, was it for a set price, or was it to pay off the existing mortgage? It was for a set price. But was it to pay off the existing mortgage? No, it was a set price that included several components. It included money that was on the judgment, which was already in. It included fees and expenses and other incidentals. As I say, what all of it included is, I think, probably going to be the subject, or would have been the subject of contested testimony of some sort. But the fact is, didn't you believe that one of the purposes of the settlement agreement was to pay off the mortgage? Isn't that in the complaint? I don't believe that it was to pay off the mortgage. It was to pay, the terms were the outstanding balance plus certain fees and expenses. Outstanding balance was a number. Was an interim settlement used repeatedly? Well, it was a resolution, I suspect, of what's going to happen to the property, but it doesn't fall within the ambit of the credit agreement act, because if you look at Wait, run with me for just a second here. Sure. So if you're using the phrase settlement, doesn't that imply the mortgage that has to be paid off? No, it could mean a resolution of a dispute. It could mean a resolution of And the dispute was the non-payment of the mortgage. Well, no, that issue had long since been resolved. There was a judgment. This was not a At the time, there was no deficiency. There was a judgment. So to resolve the issue Well, there's no deficiency because the bank hasn't sold the property. That's where you get a deficiency balance is if they got rid of whatever asset they foreclosed on. Because they haven't done that, we're now talking about a settlement of the outstanding mortgage balance. No, Your Honor, because the order entered with respect to judgment or foreclosure and sales specifically provided, there was no deficiency. The bank admitted that the value of the property exceeded the debt. So by winning that, there was no personal deficiency left to get. When the contract, the credit agreement, that is the note in mortgage, merged into the judgment, it was extinguished. There were no longer any rights. The only rights that were to bid in that judgment and perhaps be the successful buyer and then sell the property. And interestingly enough, with respect to that, the bank prepared the order on December 18th, 2013. And in that order, it's at appendix 58 of the materials, that order specifically provided that the, if you will, credit agreement was extinguished and it was merged into a judgment. And the bank did that so that it could obtain judgment interest as part of the judgment rather than whatever interest was provided for in the contract documents. So when you get 60 days out and you're talking about a new agreement, the bank anticipating that if it is a successful bidder in and it obtains the property, it will resell it at a price that was agreed upon. That was the nature of the agreement that was pledged. The material terms, the price, and the timing were in the order agreement and they were confirmed, if you will, in the writing. That's the state of the record that existed before the circuit judge when she said, no, the Illinois Credit Agreement Act bars all of those claims. And there was financing for the purchase, but it was not provided for by the purchase, by the bank, so the bank was neither a lender nor a creditor. It was merely under the agreement that was pled, the seller of real estate, that it foreclosed upon and for which there was no agreement left to have involved. There was no longer any agreement. And the new agreement did not satisfy the definitions of the Illinois Credit Agreement Act. And therefore, that was a new agreement. At the very least, the case should have proceeded with discovery to answer some of the questions which Justice Ellis has raised and you, Justice Burke, have raised, but we didn't get that far. And the only support, and I can have some way, I think, based upon the relationship, this was a long-time bank customer. They had a close relationship. They were not trying to hurt the customer, at least we didn't think so, until after we asked, because the bank never sent any wire instructions for the money. They didn't say, please pay us. They came to us and said, well, we're not going to honor that agreement. We want $10 million. So they used the agreement from the 19th as a way to make sure nothing happened at the foreclosure. Nobody bid in or our folks didn't find somebody that would bid in more. We relied on that agreement to buy it back for $3 million. And once they acquired, and the time passes, that is the 30 days required before you can confirm the sale, then they don't want the number we agreed on. They want $10 million. That's and that really, and then they rely on the Credit Agreement Act, knowing full well that they're the ones that asked that the credit agreement actually be merged into the judgment. It is the kind of abuse with respect to the Credit Act that courts have written about. And this appeal gives to this court the opportunity to address the issue of whether the doctrine of merger applies with credit agreements under the Credit Act. We are confident that based on the case law that the answer will be yes. But it's an opportunity to address that issue. Because according to my distinguished colleague, virtually anything that has anything to do with this property, no matter what the time, no matter what the background, the credit agreement bars it. The circuit judge also granted the motion to dismiss with prejudice with respect to one of the parties who had a complaint, an IID complaint based upon conduct that took place after the judgment of foreclosure. She was a person that was never a party to any agreement, never borrowed the money, and was not at all involved in anything that falls within the definitions of debtor in the Credit Act. And yet, without any discussion or analysis, her claims and certain breach of judicial duty claims were dismissed with prejudice, without any analysis or discussion. I simply, when we go to the Illinois Credit Act and you think about the purposes of it, clearly the agreement does not fall within it, nor do the individuals who've never been part of a credit agreement or who have claims that arise after a judgment is entered. How can they be barred by a credit agreement act when there is no credit agreement, having it been extinguished by the entry of a judgment? So your position is that you are not relating this in any way to the credit agreement because, the initial credit agreement, because you were contemplating the completion of the foreclosure process and the sale to Metropolitan. You made the agreement before the sale, but you were contemplating all action to be taken after. Right. I mean, if you get it, that's correct, sir. The fact remains that there were a number of proceedings which took place beforehand, but you get to February of 2014, and you have a situation where there's a judgment of foreclosure and sale, and we ended up negotiating a simple real estate purchase from the person who was going to recover the property using, I believe, the judgment. That is not a credit agreement within the definition of the statute. There are a number of other issues that are in the briefs that were raised but were never discussed by the trial judge. They're touched on in our reply brief because they were raised as a late argument in the response brief, saying, oh, well, even if you don't have a credit act, even if that fails, then we have all these other issues that were never addressed by the court. I don't know whether you all wish to comment on that, but from our perspective, the key to all of this lies with the Illinois Credit Agreement Act. Okay. Thank you, Mr. Dickey. We'll preserve some time for you for rebuttal. Thank you. Mr. Fleming. Good morning again, Your Honors. May it please the Court. The legislature determined 30 years ago when it enacted the Credit Agreements Act that lenders should not be subject to claims arising out of alleged old agreements. And the reason for that is simple, because it's just too easy to make up these alleged old agreements. And in addition to the Credit Agreements Act, almost 200 years ago, statutes were enacted that required that the sale of real property or any interest in land that extends beyond the year must be in writing and must be signed by the person charged. And thirdly, courts in Illinois and elsewhere have determined that once a final judgment has been entered and all appeal rights have been exhausted, the matter is final. The matter is over. And this appeal, with all due respect, purports to trample over those three basic principles. In our belief, we've set out a roadmap of why we believe the judgment below should be affirmed. All of the claims are barred by the Credit Agreements Act. They're barred by the statute of frauds. They're barred because they represent a collateral attack on the judgment of the Kane County Circuit Courts, which granted the bank possession of the property, a judgment which was affirmed on appeal by the He says he's not attacking the credit agreement. He's not attacking the judgment of foreclosure. He's not attacking the confirmation of sale. He's just saying, we had a deal that you'd sell me back the land. Okay. Isn't that all he's saying? How is that a credit agreement? Okay. Well, I'll tell you what's a credit agreement. First of all, in order for this argument to apply, he has to apply the merger doctrine. The merger doctrine does not apply to non-final judgments. And this court in the Koran case found that. So the merger agreement doesn't apply here. But let's, for argument's sake, say it does. And let's say that the credit agreement is out the window. It was extinguished. Does the Credit Agreement Act still apply here? Yes, it does. And why is that? Because the election agreement is itself a credit agreement. It is an agreement that they say the bank agreed to acquire title to the property. And then at some time in the future, and by the way, that's unspecified. They don't say when we're supposed to transfer the property back to them. But sometime after we get possession, so that means you've got to go through a sale, confirmation of a sale, and 30 days thereafter, then the bank can get title. Then they will transfer the property to them in exchange for payment of the outstanding loan amount and all of the bank's fees and costs in the foreclosure. This notion that there's a $3 million sales price, that's been made up today. And it's not what appears in the complaint. So now, why does it violate the credit, why is that a credit agreement? That's asking the bank to delay the payment of money, and that's one of the rubrics in the Credit Agreements Act. So the agreement is, I want to delay paying you the outstanding loan balance until sometime in the future, 30, 60 days, who knows when. Some unspecified date in the future, the bank, please hold on, allow me to delay payment, and then when I pay you that money, you will transfer ownership. It's also a credit agreement, and for another reason, it requires the bank to fill time for retaliatory damages. But at that point, it's no longer a liability of the plaintiff, right? I mean, at that point, after there's been a sale, it's been confirmed, that's all done, and you've got the property. So they may have picked a number. I grant you, of course, it's the same party that defaulted on the loan, but now they're coming before you, and they're picking a number that is a reasonable number to pick if you're talking to a bank who's acquiring property. It's the mortgage that they want to make themselves whole, and they said, we'll cover that mortgage. But let's say it wasn't the plaintiff. Let's say it was a completely different entity coming in. Just a completely different entity came in and said, we see what just happened here. We see what mortgage you're trying to make up. We're willing to cover the cost of that mortgage and your costs if you'll sell us the property. Would that be a credit agreement? That would be a credit agreement if, as part of that agreement, the bank had to delay the payment of money. So, bank, please hold up. I want to pay you money in the future for all these things. Hold up on what? Hold up on exercising their remedies. Acquiring title to the property and selling it to another party. Or taking possession, or doing whatever else the owner of real estate can do with property. They're saying, hold up, don't exercise those rights that you have. Sell it to me, sometime in the future, 30 days, 60 days, 90 days, next year. Agree to do that. Well, now you've required the bank to delay the payment of money. You've required the bank to forbear from exercising remedies. And those fall squarely within the language of the statute. And so the original agreement is itself a credit agreement. Now, I don't believe the merger doctrine applies here. And I believe, consistent with the decisions of this court, does not apply because it was an interlocutory, non-final judgment. And so, without that, clearly we have a violation of the Credit Agreements Act. Because this alleged loan agreement is an agreement to amend the existing underlying loan agreement. It basically says, agree that, again, some unspecified date in the future, we can pay off the outstanding loan balance and receive the property. So either way, the merger agreement applies or it doesn't apply. The claims here run afoul of the Illinois Credit Agreements Act. Our second argument is, of course, the statute of frauds. The statute of frauds clearly applies here. I mean, there's nothing clearer than, if you want to buy someone's real property, it has to be in writing. It has to be signed. And, you know, I heard no argument today as to why the statute of frauds applies. I think in the briefs there's an argument that, well, maybe the doctrine of part performance here somehow excuses it. But all that was ever done was the submission of this unsigned real estate contract. It didn't come from the person who allegedly entered into the oral agreement. It was from some third party. It was an unsigned draft agreement that contained 30 conditions, 30 conditions on the bank. The bank had to cure defects entitled. There was also a right by the buyer to conduct an inspection, and if they didn't like the results of the inspection, then they were entitled to rescind the offer. So clearly there was no performance here. There was no tendering of money. Remember, they're 30 years into the original agreement. The bank agreed to transfer upon the payment of the outstanding amount. That never occurred. And, in fact, the second district analyzed this issue, and in affirming the King County Circuit Court, specifically found that the evidence that had been presented to the King County Circuit Court established that Mr. Oury had never performed under the oral agreement. And so that really ties into the doctrines of race judicata, collateral estoppel, and collateral attack. You know, there just really is no claim here. And when we talk about the statute, and the statute is very broad, the statute applies to any claims in any way related to a current agreement. The intentional friction of emotional distress, that arises directly out of the current agreement. The allegation is that the bank refused to honor the alleged oral agreement, told Mr. Oury's wife that she would have to leave the property, and that that was the intentional infliction of emotional distress. Well, that's a claim that arises out of the current agreement's act, and so it's barred. And Mr. Oury's wife, Karen, she does fit within the definition of a debtor under the statute, because a debtor is defined as a person... Why does the credit agreement bar the IAED claim? I don't understand. How do you put an IAED claim? It's partly because it is a claim that is related to a credit agreement. So first of all, the first step in the analysis is, under the definition of the term debtor, is a person who obtains credit or seeks a credit agreement, or claims the existence of a credit agreement with a creditor. So Karen says, hey, bank, you entered into a deal with my husband, a literal agreement that you would transfer the property in exchange for a future payment. You have now breached that agreement because you've told me to vacate the property. That is extreme and outrageous conduct, and as a result, I have suffered intentional infliction of emotional distress. It's the breach of the oral agreement that she's saying caused emotional distress. That's exactly right, that the bank would not honor the oral agreement. Which you're saying is not a credit agreement, right? I am saying that it is a credit agreement. You're saying that's right. I'm sorry. Absolutely. I say both ways. No, you are. You are. You're right. I'm sorry. But I don't really think that that's the correct analysis, because I don't think the merger doctrine applies here. So I think the correct analysis is, there is no merger doctrine. You don't need to get to the issue of whether the IHR agreement is a credit agreement. But if you do, it is, because it requires the delay of payment of money or foot balance from exercising remedies. And so it is very broad, and it's broad for a reason. The legislature, you know, right along, the legislature wanted to end these kinds of lender liability claims. And that's why the statute is broadly written and has been broadly interpreted by this court as well as the Supreme Court. And for those reasons, we believe the judgment should be affirmed in all respects. Thank you. Thank you, Mr. Williams. Do you have a few minutes? Of course, Mr. Dickens. I didn't mean to interrupt. No, not at all. There are a number of cases that are cited with respect to the supposed incredible breadth of the Illinois Credit Agreement Act, which has just been stated, related to, and we have McBride Chevrolet, VR Holdings, Royal Proof. And they're all in there that draw distinctions. The related to language, if you simply take a look at ordinary English and the statutory construction of related to, that's a causal connection. It has to relate back to the language in the statute which provides what is covered by the statute. And the suggestion that an IIED claim is barred by Illinois Credit Agreements Act is, quite frankly, absurd. Think about it this way, the way the argument would run. A bank that has a loan agreement, mortgage and note with a customer, has one of its employees commit a tort against somebody who comes into the bank who is a member of the family of that customer. Well, since they're a bank customer, it's related to it because the person came into the bank and they have a credit agreement. I mean, you can take the idea of related to and stretch it as far as you want. That is clearly not what the case law suggests. And indeed, the cases suggest that in the hands of unscrupulous lenders, we need to be careful about the extension of this statute to bar legitimate claims. So there is no credit agreement that would bar Karen Orley's claims. And it relates to the conduct set forth in the complaint, which involves a number of incidents of outrageous behavior. That analysis was never made by the trial court. And there is certainly no evidence whatsoever, because there isn't any, that Karen Orley was ever a part of the agreement. With respect to the suggestion that there was a delay in payment, that's just a specious argument. If you look at the agreement, the agreement was that we will pay these dollars when and if the bank acquires the title. There's nothing about any delay. And when was that to be paid? When the bank was going to obtain title. How does it work in foreclosure? There's a judgment of foreclosure and sale. Then there's a sale. But the bank that acquires the property at that sale can't sell it the same day. There's a statutory 30-day holding period. So by its very terms, the bank was agreeing to wait for payment until after it was in a position to deliver title. Now, having a judgment, and this was a different deal. Mr. Orley, they did not have the money to pay the judgment. Hence, why are there then the foreclosure? But to regain the piece of property on which he and his family had lived for 30-some years, they found a third-party financer that submitted a writing that had the material terms. The money agreed upon. The agreement to pay it when there was title. There was nothing the bank could deliver on a simple real estate sale until it had title. So to suggest that because there was a time period that that falls within the ambit of the statute simply misreads the language of the statute or misinterprets this agreement. With respect to the finality, there are two key arguments. Number one, the merger doctrine applies whenever there is a judgment in foreclosure or a judgment on a contract. The question that I think may be a first impression here is, does the merger doctrine continue to apply in the face of a credit agreement? There is no suggestion in the statute that it doesn't. There is not one decided case that suggests because a contract is a, quote, the long-standing Illinois law with respect to the merger of contracts into the judgment. And finally, with respect to that very point, it is very disingenuous of the appellees to suggest that somehow the merger doctrine does not apply here when, if you look at their very motion in order, their language is that the note in mortgage is extinguished and merged into the judgment. So the very order the bank prepared in by which it obtained its judgment contains the language of extinguishment of the contract and merger into the judgment. And with respect to that issue about finality, the case law makes it clear that merger works with judgment. The finality of the confirmation is under the law the time by which an appeal must start to run. So it is the final point in the process when an adverse decision on a confirmation, your time for appeal starts. But that has nothing to do with the fact that there's a judgment. And indeed, in this case, if because the judgment of foreclosure and sale was interlocutory, as Mr. Fremen just suggested, well, I suppose the bank could have made a motion to vacate the judgment of foreclosure and sale on some basis. I suppose it might have been possible for the appellants, one of them, to make a motion to vacate a minimocratory order assuming the elements had been met. But we know as a fact that as of February 20th, none of that happened, and the performance under the agreement was not to occur until after the 30-day confirmation order period ran. And we also know, because it's undisputed, that a writing imbibing the oral agreement was submitted five days after the bank obtained the property at the sale. And yet, the bank never tendered instructions. It never said whether the money, and it never said a closing date. Why did it not do that? Because the deal was you can buy the property when we're in a position to sell it. And that time frame hadn't run by virtue of the very existence of the agreement that was planned. So taking those points, I would simply reiterate that appellants believe that the decision of the lower court dismissing everything with prejudice should be reversed, and the cause be amended to the circuit court for further proceedings including discovery and hopefully a trial. Thank you for your time. Thank you. Thank you, Mr. Dickey. Thank you, Mr. Fleming. A difficult case, and we appreciate your very good presentations on both sides. We'll take another advisement and stand adjourned.